Approved: _____
RUSSELL CAPONE / MARTIN BELL / S. BAOF N.Y. NAWADAY
Assistant United States Attorneys

Before: HONORABLE DEBRA FREEMAN
United States Magistrate Judge
Southern District of New York

DOC # _____

- - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :     SEALED COMPLAINT

                                        Violation of
        - v. -                    :     18 U.S.C. § 1343

HAMLET PERALTA,                   :     COUNTY OF OFFENSE:
                                        NEW YORK
        Defendant.                :

- - - - - - - - - - - - - - - - -x

16 MAG 2263

SOUTHERN DISTRICT OF NEW YORK, ss.:

JOSEPH DOWNS, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

COUNT ONE

(Wire Fraud)

1. From at least in or about July 2013, up through and including at least in or about 2014, in the Southern District of New York and elsewhere, HAMLET PERALTA, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, willfully and knowingly did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, PERALTA solicited millions of dollars from investors by falsely representing that PERALTA would use the investors' money to purchase and re-sell wholesale quantities of liquor, when, in truth and in fact,

1

PERALTA used investors' money to repay other investors and enrich himself.

(Title 18, United States Code, Section 1343.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

5. I have been a Special Agent with the FBI for approximately 11 years. I am currently assigned to a public corruption squad in the FBI's New York Field Office. As a special agent, I have participated in investigations of fraudulent schemes involving the use of the wires.

6. The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources and agents, including documents and information provided to me by investors and employees, a review of bank records, and information provided to me by witnesses who participated in conversations with HAMLET PERALTA, the defendant. Because this affidavit is prepared for limited purposes, I have not set forth each and every fact I have learned in connection with this investigation. Where conversations and events are referred to herein, they are related in substance and in part. Where dates, figures, and calculations are set forth herein, they are approximate.

## Relevant Entities and Individuals

7. Based upon my review of publicly available documents and bank records, and my discussions with investors and employees, I know that HAMLET PERALTA, the defendant, was previously the President of West 125th Street Liquors, a corporation that operates a liquor store in the vicinity of West 125th Street in New York, New York.

8. Based on my review of publicly available documents and my discussions with witnesses, I know that PERALTA's sister is presently the President of West 125th Street Liquors (the "President") and has been for at least the past six years.

2

## The Scheme to Defraud

9.     Based upon my review of documents provided to me by investors, documents provided by banks, and interviews of investors and other witnesses, I have learned that, from at least in or about July 2013, up to and including at least in or about 2014, HAMLET PERALTA, the defendant, solicited more than $12 million dollars from various investors by falsely representing that the investors' money would be used to engage in wholesale liquor distribution for a profit. PERALTA promised investors high rates of return in the form of regular interest payments on their investments, which he represented were based on the profits to be generated by what he claimed would be his successful wholesale liquor business.

10.     In truth and in fact, however, between 2013 and at least 2014, HAMLET PERALTA, the defendant, misappropriated millions of dollars of investors' funds, and used those funds to repay other investors or for his own purposes. As set forth in more detail below, of the more than $12 million provided to him by investors based on the representation that their money would be used to purchase wholesale liquor for resale, PERALTA in fact purchased no more than $700,000 in wholesale liquor. PERALTA used nearly all of the remaining money - more than $11 million - to repay other investors, wire money to himself, take out large cash withdrawals, and pay for personal expenses other than liquor.

## Bank Accounts Used to Facilitate the Scheme

11.     In connection with this investigation, I have reviewed summaries prepared by analysts of the FBI and the United States Attorney's Office for the Southern District of New York of bank account data for multiple bank accounts in the name of West 125th Street Liquors, Inc. (the "West 125th Street Liquors Accounts") and in the name of HAMLET PERALTA, the defendant (the "PERALTA Accounts"). Based on this review and my interview with the President of West 125th Street Liquors, PERALTA's sister, I learned the following:

a.     PERALTA was not a signatory on the West 125th Street Liquors Accounts during the time periods at issue herein, and the only signatory to those accounts was the President.

b.     Beginning in 2013, PERALTA, with the President's permission, began using the West 125th Street Liquors Accounts to receive large wire transfers and to wire and/or write

checks to the individuals and entities who had sent the wire transfers. PERALTA told the President that the incoming wire transfers represented loans to be used in connection with a restaurant in Manhattan that PERALTA owned and operated (the "Restaurant"), and that the outgoing transfers and checks represented repayments on the loans. While the President retained sole control over the West 125th Street Liquors Accounts, she permitted PERALTA to use them for incoming wire transfers, and on a few occasions went with PERALTA to the bank to conduct outgoing wire transfers. In addition, PERALTA had access to pre-signed checks for the West 125th Street Liquors Accounts.

          c. The large wire transfers and check deposits discussed herein were not conducted by the President or in connection with official business at West 125th Street Liquors.

### Representations to Individual Investors

*Investor 1*

          12. Based on my discussion with an individual ("Investor-1") who provided money to HAMLET PERALTA, the defendant, my review of documents provided by Investor-1, and my review of bank records for the West 125th Street Liquors Accounts and PERALTA Accounts discussed above, I have learned the following:

          a. Beginning around 2010 and proceeding for several years, Investor-1 spent time in the Restaurant, where he eventually became friendly with PERALTA.

          b. In or about 2013, PERALTA told Investor-1 that he was about to begin a wholesale liquor business and was seeking investors for that business. PERALTA told Investor-1 that he owned West 125th Street Liquors – when, in truth and in fact, it was owned by the President. PERALTA further informed Investor-1 that he (PERALTA) had been approved as an exclusive wine distributor to a major national restaurant supply company (the "Restaurant Supply Company") that was beginning a wholesale wine business. PERALTA told Investor-1 that his (PERALTA's) role would be to source, purchase, and supply large quantities of wine to the Restaurant Supply Company.

          c. Investor-1 recalled that PERALTA promised to pay four percent interest on the investments, although, as noted

below, one note that PERALTA provided to Investor-1 provided for a two percent return.

    d. Based on PERALTA's representations, Investor-1 agreed to invest in PERALTA's business.

    e. Over the course of the next year, Investor-1 provided money on multiple occasions, by check, both to the West 125th Street Liquors Accounts and the PERALTA Accounts, totaling more than $3.5 million. Of that amount, none, or at most only a minimal amount, was spent on wholesale liquor purchases, as PERALTA had represented to Investor-1. Rather, Investor-1's money was used to pay back other investors; to pay for expenses such as restaurant tabs and high-end clothing purchases; and to be wired to PERALTA's personal accounts and/or withdrawn in cash.

    f. For example, on or about August 29, 2013, a $250,000 check from Investor-1 was deposited into a West 125th Street Liquors Account. Immediately following that transaction and on the same day, a $250,000 wire was sent from the same West 125th Street Liquors Account to an entity that I know, based on this investigation, to be another investor in PERALTA's liquor scheme ("Investor-2"). In the course of the next month, less than $20,000 was transferred from the same West 125th Street Liquors Account to entities I believe to be wine or beverage distributors. Based on my discussions with the President of West 125th Street Liquors, I believe that even this less than $20,000 amount was not paid to further PERALTA's purported wholesale liquor business, but instead was used to purchase wine and liquor to be sold at West 125th Street Liquors to retail consumers.

    g. Over the course of two transactions on or about October 3 and 4, 2013, the West 125th Street Liquors Account wrote two checks to Investor-1 that were cashed for a total of $297,000, ostensibly representing the principal and interest on Investor-1's August 29, 2013 investment. Also on October 3, 2013, the West 125th Street Liquors Account had received a $300,000 wire transfer from an individual who I know based on the investigation to be an investor in PERALTA's liquor scheme who also recruited others to invest in the scheme (the "Recruiter"). As noted above, the only liquor purchases in the time period between Investor-1's investment and return were less than $20,000 in purchases that appear to have been for liquor to be sold at West 125th Street Liquors, a retail store.

5

h.  On or about October 15, 2013, a $250,000 check from Investor-1 was deposited into a West 125th Street Liquors Account.  Two days later, checks totaling $270,000 from the West 125th Street Liquors Account were cashed by a law firm, an engineering firm, and an unknown individual.  No checks, wires or other outgoing activity in the interim from the West 125th Street Liquors Account reflects payments to wine or beverage distributors.  Indeed, over the course of the next month, less than $70,000 was transferred from West 125th Street Liquors to entities I believe to be wine or beverage distributors.  Based on my discussions with the President of West 125th Street Liquors, I believe these to be for purchases of wine and liquor to actually be sold at West 125th Street Liquors to retail consumers, and not for PERALTA's separate wholesale liquor business.

i.  On or about January 8 and 9, 2014, Investor-1 sent two wires totaling $490,000 to a West 125th Street Liquors Account.  The very same days, the same West 125th Street Liquors Account wired $390,000 in total to Investor-2 and to an individual who, based on the investigation, I believe to be another investor in PERALTA's liquor scheme ("Investor-3").

j.  On or about March 10, 2014, Investor-1 cashed a $350,000 check from a West 125th Street Liquors Account.  Five days before that check was cashed, the same West 125th Street Liquors Account had received a $2,000,000 wire transfer from an entity that, as discussed below, I know to be another investor in PERALTA's liquor scheme ("Investor-4").

k.  On or about March 26, 2014, Investor-1 wired $500,000 to a PERALTA Account.  The next day, the same PERALTA Account debited $494,000 to an account for Investor-4.[1]  Over the course of the next month, the PERALTA Account transferred less than $10,000 to entities I believe, based on the names of the entities to which money was transferred, to be wine or beverage distributors.

l.  On or about May 15, 2014, Investor-1 wired $1,200,000 to the PERALTA Account.  The same day, $1,020,000 in cash was withdrawn from the PERALTA Account.  Over the course of the next month, the PERALTA Account transferred less than $15,000 to entities that, based on the names of the entities to which money was transferred, I believe to be wine or beverage

---

[1] Two checks to a restaurant group from the PERALTA Account totaling $30,000 were also cashed on March 27, 2014.

6

distributors. Based on my discussions with the President of West 125th Street Liquors, I believe these to be for purchases of wine and liquor to actually be sold at West 125th Street Liquors to retail consumers, and not for PERALTA's separate wholesale liquor business.

m. Concurrent with the May 15, 2014 investment of $1,200,000, PERALTA provided Investor-1 with a loan agreement and note (the "Note"). I have reviewed the Note, dated May 15, 2014, which is signed by PERALTA individually and again as a guarantor in his capacity as "President" of West 125th Street Liquors. The Note documented that Investor-1 had loaned PERALTA $250,000 "to be used by Borrower for the purpose of purchasing liquor to be sold and Borrower's business known as West 125th Street Liquors"; stated that PERALTA would pay back the balance plus two percent interest by May 22, 2014; and stated that if PERALTA failed to make the required repayments, PERALTA would transfer his "ownership interest" in West 125th Street Liquors to Investor-1. As noted above, PERALTA at the time had no ownership interest in West 125th Street Liquors and was not the President of West 125th Street Liquors.

n. Based on my review of the West 125th Street Liquors Accounts and the PERALTA Accounts, and my discussions with Investor-1, Investor-1 provided PERALTA in total with more than $3 million in financing and is still owed in excess of $1.5 million by PERALTA.

o. Investor-1 has supplied me with a document provided to Investor-1 by PERALTA in or about June 2014. The document purports to be on letterhead for the Restaurant Supply Company, and indicates that the Restaurant Supply Company will be electronically transferring PERALTA and West 125th Street Liquors $1,826,350.00 within seven days.

13. I have spoken with a representative from the Restaurant Supply Company (the "Representative") and provided the Restaurant Supply Company with a copy of the document referenced in subparagraph 12(o) above. According to the Representative, neither HAMLET PERALTA, the defendant, nor West 125th Street Liquors has ever supplied the Restaurant Supply Company with wine, and the document was not issued by the Restaurant Supply Company.

*Investor-4*

  14. Based on my discussion with Investor-4, my review of documents provided by Investor-4, and my review of the West 125th Street Liquors Accounts and PERALTA Accounts as discussed above, I have learned the following:

  a. Investor-4 invested in the wholesale liquor business of HAMLET PERALTA, the defendant, which was proposed to him by the Recruiter. Investor-4's understanding of the investment from the Recruiter was that the money he invested was to be used by PERALTA to purchase large quantities of liquor that PERALTA would re-sell on a wholesale level at a profit. Investor-4 was promised a two percent rate of return on his investment.[2]

  b. Investor-4, through a corporate entity, began wiring money to PERALTA in several installments in furtherance of the investment.

  c. For example, on or about January 30, 2014, Investor-4 wired $2,000,000 to a West 125th Street Liquors Account. Over the course of the 10 days following this investment, the same West 125th Street Liquors Account wired in excess of $160,000 to a wholesale beverage distributor. In addition to that wire, during the same time period, the following activity, among other more minor activity, occurred in the West 125th Street Liquors Account:

    i. $765,000 was paid by check back to Investor-4.

    ii. $50,000 was paid by check to Investor-1.

    iii. $306,000 was paid by check to the Recruiter.

    iv. $200,000 was deposited into bank accounts for PERALTA.

    v. Nearly $70,000 was withdrawn in cash.

---

[2] I have interviewed the Recruiter, who stated that his understanding of the investment came directly from HAMLET PERALTA, the defendant, and who in turn conveyed that to Investor-4 and certain other investors.

8

    vi.  Approximately $105,000 was paid to New York State tax authorities.

    vii.  More than $500,000 was paid to entertainment companies not involved in beverage distribution.

   d. On or about March 4, 2014, Investor-4 again wired $2,000,000 to the West 125th Street Liquors Account. Over the course of the next three weeks, less than $15,000 was transferred from the same West 125th Street Liquors Account to entities I believe to be wine or beverage distributors. Based on my discussions with the President of West 125th Street Liquors, I believe these to be for purchases of wine and liquor to actually be sold at West 125th Street Liquors to retail consumers, and not for PERALTA's separate wholesale liquor business. During that same time period, the following additional activity, among other more minor activity, occurred in the West 125th Street Liquors Account:

    i. $350,000 was paid to Investor-1.

    ii. $255,000 was paid to Investor-2.

    iii. $520,000 was paid to an individual I know, based on the investigation, to be another investor in PERALTA's liquor scheme ("Investor-5").

    iv. Nearly $70,000 was deposited into bank accounts for PERALTA.

    v. Nearly $40,000 was withdrawn in cash.

    vi. Approximately $14,000 was paid to New York State tax authorities.

    vii. Approximately $250,000 was paid to an entertainment company not involved in beverage distribution.

   e. On or about April 17, 2014, Investor-4 wired $500,000 to a West 125th Street Liquors Account. Over the course of the next three weeks, less than $25,000 was transferred from the same West 125th Street Liquors to entities I believe to be wine or beverage distributors. Based on my discussions with the President of West 125th Street Liquors, I believe these to be for purchases of wine and liquor to actually be sold at West 125th

Street Liquors to retail consumers, and not for PERALTA's separate wholesale liquor business.

f.  Based on my review of the West 125th Street Liquors Account, and my discussions with Investor-4, in total, Investor-4 provided PERALTA with more than $5,000,000. Investor-1 has received approximately $2.9 million in check or wire transfer payments from the PERALTA Accounts or West 125th Street Liquors Accounts, and has received a small amount compensation in cash from the Recruiter. In all, Investor-4 estimates that he is owed more than $2,000,000 on his principal.

### Other Investors and Overall Account Activity

15. Based on my discussions with the Recruiter, my review of the bank account data for the West 125th Street Liquors Accounts and the PERALTA Accounts, and my review of e-mails obtained pursuant to a search warrant for an e-mail address used by HAMLET PERALTA, the defendant, I have identified approximately 12 investors in PERALTA's scheme, including the five investors discussed above. Investor-1 and Investor-4 were, by far, the largest investors in the scheme by dollar amount.

16. For all of the additional investors, I have reviewed notes executed by HAMLET PERALTA, the defendant, which contain largely the same language as the note provided to Investor-1, discussed above. Each of the notes represented that the loans were made for "purchasing liquor to be sold," and provided for repayment to be made within one week to 90 days with approximately two percent interest. The notes falsely represented that West 125th Street Liquors was "Borrower's [PERALTA's] business," and/or that PERALTA was the "sole shareholder" of West 125th Street Liquors, and that PERALTA would transfer his "ownership interest" in West 125th Street Liquors to the investor in the event of a default.

17. Based on my review of the account activity for the West 125th Street Liquors Accounts and the PERALTA Accounts, and with respect to investments made by the additional investors, I have learned that, as with Investor-1 and Investor-4, in almost every instance, the money transferred by investors to the West 125th Street Liquors Accounts and/or the PERALTA Accounts was not used to purchase wholesale quantities of liquor, and in several instances, within days of an account receiving money from a particular investor, money was wired out to a different investor.

18.     Based on my review of the account activity for the West 125th Street Liquors Accounts and the PERALTA Accounts during the time period July 2013 through June 2014, i.e. the time period in which investors were providing PERALTA with money, I have learned the following:

      a.     PERALTA received over $12 million in investments.

      b.     PERALTA purchased less than $700,000 in liquor, excepting smaller liquor purchases of $10,000 or less, each of which I believe, based on my discussions with the President, to be for liquor to actually be sold at West 125th Street Liquors to retail consumers.

      c.     In addition to paying back other investors; paying for non-liquor expenses as discussed above; and being converted to cash; investors' money was also used to pay numerous personal expenses such as restaurant bills, high-end clothing purchases, gas, and spa treatments.

WHEREFORE, the deponent prays that an arrest warrant be issued for HAMLET PERALTA, the defendant, and that he be imprisoned or bailed as the case may be.

_____
JOSEPH DOWNS
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
6th day of April, 2016

_____
THE HONORABLE DEBRA FREEMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

11